UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | No. 1:97-CR-00118-RLY-MG |
| | ) | |
| ANTHONY BAILEY, | ) | -03 |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SUR-REPLY TO DEFENDANT'S MOTION TO REDUCE
SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

The United States of America, through undersigned counsel, submits this

Sur-Reply[1] to Defendant's Reply to Government's Response in Support of Motion for

Sentence Reduction Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) to briefly address three

points:

1. To correct the factual record regarding Defendant's age at the time of the

   offense;

2. To address Defendant's assertion that no one was hurt during this offense;

   and

3. To respond to Defendant's legal argument regarding the inquiry into his

   rehabilitation and the § 3553(a) factors.[2]

---

[1]    In its Response, the government requested the opportunity to respond to pro
bono counsel's new arguments under § 1B1.13(b)(5). (Response at 15-16 n.5.)
[2]    The government additionally provides as supplemental authority a case
recently decided in the Northern District of Illinois rejecting the same arguments
Defendant raises here and concluding that "the amended U.S.S.G. § 1B1.13(b)(6) is

First, throughout his Reply, Defendant repeatedly states that he was only 23 years old at the time of the offense.  That is incorrect.  He was 32.  (*See* Ex. 1 at 2 & ¶ 73.)

This hardly qualifies as young age.  Indeed, all of the cases and research cited by Defendant to justify young age as an extraordinary and compelling factor considered it for defendants who were in their late teens or early twenties.  (*See, e.g.*, Reply at 16 n.11.)  In fact, the neuroscience research regarding brain development cited by Defendant confirms that his brain, including the regions responsible for self-control and judgment, was already completely developed. [3] Defendant nonetheless chose to commit these heinous crimes well into his adulthood.

Defendant wasn't young, and this offense was certainly not a single mistake that "capped off a troubled youth," as Defendant suggests.  (Reply at 6.)  Rather, by the time he committed the instant offense, Defendant had already been convicted of robbery twice, auto theft, battery on a police officer, and more when he was in his early twenties.  (Ex. 1 at 11-12.)  Defendant's arguments regarding young age are therefore completely irrelevant.  Instead, his age at the time of the offense weighs against him.

---

not a reasonable reading of § 3582(c)(1)(A)."  *United States v. Black*, No. 05 CR 70-4, 2024 WL 449940, at *12 (N.D. Ill. Feb. 6, 2024).

[3]    James C. Howell et al., *Bulletin 5: Young Offenders and an Effective Response in the Juvenile and Adult Justice Systems: What Happens, What Should Happen, and What We Need to Know* 18 (2013) ("Hence adolescents and young adults simply do not have the physiological capacity of ***adults over age 25*** to exercise judgment or control impulses.") (emphasis added).

Second, in his Reply, Defendant continues to minimize the impact his actions had on his victims, as he again repeats his baseless claim that "there were no lasting physical injuries," (Dkt. 177 at 6) and "no one was hurt," (*id.* at 25 n.17). (*See also* Dkt. 157 at 28 ("there was no [one] permanently injured as a result of his crime"); *id.* at 30 ("[f[ortunately, no one was permanently injured").)   Again, this is incorrect.  The PSR detailed the trauma of several of Defendant's victims who were restrained and held at gunpoint.  This includes a school-aged girl who opened her bedroom closet door one afternoon to find Defendant pointing a gun at her.

Significantly, less than five years ago, several of the victims recounted the trauma they still endure.  (*See* Dkt. 82.)  Of particular note, the father of the school-aged girl, who was forced to drive the three defendants to Indianapolis while his wife and daughter were tied up in their home, testified:

> We still remember. We've got scars and it's hurt my daughter real bad. In fact, she's not here any longer. I think she died, I don't know -- anyway, she's had that on her mind the whole time and she's single mother living at home, was scared to death about all the time trying to raise her two kids. And anyway, I'll never forgive you for that and I'll never get over it."

(*Id.* at 40.)  And the girl's mother similarly described how her daughter "was so devastated that she never recuperated.  Her entire life was changed … she was never the same."  (*Id.* at 46-47.)  Even still, another victim testified that, despite the 22 years that had passed, the "tremendous emotion that I feel inside, even when I repeat this narrative account, makes me shake inside.  I honestly can say that the events of September 3rd, 1997 have changed my life."  (*Id.* at 53.)

Defendant's statements discounting this long-lasting and severe trauma demonstrate his continued lack of accountability.  And, they completely belie Defendant's claim that he's shown "immense remorse for [his] past conduct."  (*See* Reply at 25 n.17.)

Finally, Defendant spends much of his Reply focusing on his rehabilitation, and he asks the Court to evaluate the § 3553(a) factors in the context of who he is today, not who he was when he committed the offenses.  But the Court considered these arguments in 2020 (*see* dkt. 112) and in 2022 (*see* dkt. 152).  Nothing has changed since then, and Defendant offers no reason from the past 18 months to revisit that analysis.[4]

More fundamentally, Defendant's argument for release under the newly promulgated U.S.S.G. § 1B1.13(b)(5)—based on his rehabilitation, "youth" at the time of the offense, medical conditions, and strong familial support—essentially boils down to a petition for parole.  The problem with this argument is that

---

[4]    In addressing Defendant's dangerousness, the government in its Response cited the Court's August 13, 2020 Opinion which stated: "Defendants who commit violent felonies are more likely to recidivate than those who commit non-violent felonies, and defendants who commit robberies are more likely to recidivate than defendants who commit other violent felonies." (Dkt. 112 at 9.)  Defendant calls this a "baseless stereotype." (Reply at 20 n.17.)  Defendant overlooks, however, that the Court cited United States Sentencing Commission research and provided a link to the report when making this statement.  (Dkt. 112 at 9 (citing United States Sentencing Commission, Recidivism Among Federal Violent Offenders 16, 27 (Jan. 2019) ("Violent offenders recidivated at a higher rate than non-violent offenders in every age group at the time of release from prison, and the gap between the two groups widens as age at release increases . . . Robbery offenders recidivated at a higher rate, more quickly, and for more serious offenses than did the other . . . violent instant offenders.").

Congress explicitly abolished parole when it enacted the Sentencing Reform Act of 1984 (the "Act"). *See* U.S.S.G. Ch. 1 Pt. A at 1.2 (The Statutory Mission) ("The Act also abolishes parole, and substantially reduces and restructures good behavior adjustments.")

As the current 2023 version of the Guidelines themselves acknowledge, prior to the passage of the Act and the implementation of the Guidelines, the pre-Guidelines sentencing system was a system of parole—it "required the court to impose an indeterminate sentence of imprisonment and empowered the parole commission to determine how much of the sentence an offender actually would serve in prison." *Id.* at 1.3 (The Basic Approach (Policy Statement)). "This practice usually resulted in a substantial reduction in the effective length of the sentence imposed, with defendants often serving only about one-third of the sentence imposed by the court." *Id.* The consequence of this system was "confusion and implicit deception." *Id.*

To combat this confusion and implicit deception, the Act sought to achieve "honesty in sentencing." It did so by abolishing parole: "the abolition of parole makes the sentence imposed by the court the sentence the offender will serve, less approximately fifteen percent for good behavior." *Id.* This change was meant, in part, to eliminate "uncertainty as to the time the offender would spend in prison[,]" which "was a serious impediment to an evenhanded and effective operation of the criminal justice system." *See Mistretta v. United States*, 488 U.S. 361, 366 (1989)

(discussing Senate Report on the 1984 legislation, S.Rep. No. 98-225 (1983), U.S.Code Cong. & Admin.News 1984, p. 3182).

What Defendant seeks here is a return to this pre-Guidelines system of parole—one that would make his sentence indeterminate and would result in his serving only a fraction of the sentence imposed—based on his good conduct while incarcerated.  The law is clear, however: good conduct results in a fifteen percent credit for good behavior—not the fifty-five percent discount that Defendant requests.

The promulgation of U.S.S.G § 1B1.13(b)(5) does not change that.  Though vague, subsection (b)(5)'s know-it-when-you-see-it standard[5] still "must bow to the specific directives of Congress."  *United States v. LaBonte*, 520 U.S. 751, 757 (1997); *see also* 28 U.S.C. § 994(a) (directing the Commission to craft Guidelines and policy statements that are "consistent with all pertinent provisions of any Federal statute").  Whatever circumstances qualify for relief under subsection (b)(5), they must be "extraordinary and compelling."  18 U.S.C. § 3582(c)(1)(A).  Defendant's circumstances are neither; rather, they are tantamount to a very ordinary pre-1984 petition for parole.  But parole has been abolished, and subsection (b)(5) does not, and cannot, reenact it.

Defendant received a sentence of 728 months for a heinous crime that, as discussed, left permanent scars on his victims, including a then-child whom he

---

[5]    Subsection (b)(5) affords relief when a defendant's circumstances are "similar in gravity" to the other specifically enumerated grounds for relief in U.S.S.G § 1B1.13(b)(1)-(4).

6

threatened with a gun in her own bedroom.  Notably, this sentence reflected the high end of the Guidelines, plus the mandatory consecutive § 924(c) sentences.  The court could have imposed a sentence at the low end of the Guidelines in light of the § 924 convictions, but it chose not to do so.  To allow Defendant to more than cut his sentence in half because he has behaved in prison would be to return to the pre-Act sentencing regime, eviscerating clear congressional intent to do away with that system.  It would result in the exact scenario Congress sought to avoid—confusion and implicit deception.

The Court should deny Defendant's motion.

**CONCLUSION**

The United States respectfully requests the Court deny Bailey's Motion for a Sentence Reduction.

Respectfully submitted,

ZACHARY A. MYERS
United States Attorney

By:    /s/ Meredith Wood
       Meredith Wood
       Assistant United States Attorney
       Office of the United States Attorney
       10 W. Market Street, Suite 2100
       Indianapolis, IN 46204-3048
       Telephone: (317) 226-6333
       Fax: (317) 226-6125
       Email:  Meredith.Wood@usdoj.gov

7

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2024, a copy of the foregoing was filed

electronically.  Notice and service of this filing will be sent to the following counsel

of record via the Court's CM/ECF system:

John Gleeson
Steven Garrett Tegrar
Molly Sherwood
Debevoise & Plimpton LLP
66 Hudson Boulevard
New York, NY 10001
(212) 909-6000
jgleeson@debevoise.com
sgtegrar@debevoise.com
msherwoo@debevoise.com


By:    /s/ Meredith Wood
       Meredith Wood
       Assistant United States Attorney
       Office of the United States Attorney
       10 W. Market Street, Suite 2100
       Indianapolis, IN 46204-3048
       Telephone: (317) 226-6333
       Fax: (317) 226-6125
       Email:  Meredith.Wood@usdoj.gov